IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOYSE HOWARD,<br><br>   Plaintiff,<br><br>  v.<br><br>NATIONAL RAILROAD PASSENGER<br>CORPORATION, et al.,<br><br>   Defendants.<br>               / | No. C 05-4069 SI<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

On April 27, 2007, the Court heard argument on defendants' motion for summary judgment. For the reasons set forth below, the Court GRANTS in part and DENIES in part defendants' motion.

**FACTUAL BACKGROUND**

Plaintiff Moyse Howard began his employment with defendant Amtrak on June 6, 1994. *See* Howard Decl. ¶ 3. From his date of hire until June 2003, plaintiff worked as a supervisor in a variety of capacities. *Id*. On June 16, 2003, plaintiff became the Oakland Crew Base Manager for On-Board Services ("OBS") at Amtrak's Oakland facility. *Id*. ¶ 4. In that role, plaintiff directly supervised five employees, and indirectly supervised between 150 and 200 employees. *Id*.

**1.    Termination from management**

In August 2004, plaintiff was notified him that his employment as an Amtrak manager was being terminated, and was given a termination letter which made reference to plaintiff's failure to follow management directives, misuse of company funds and failure to properly explain unauthorized

purchases. The events leading up to the termination are largely disputed by the parties.

An event which was central to plaintiff's termination was the installation of a lock on a door, and plaintiff's removal of that lock. Amtrak contracts with Gate Gourmet International ("GGI") to provide on-board catering services. Simpson Decl. ¶ 1. GGI workers are not Amtrak employees and do not report to an Amtrak supervisor. *Id.* GGI personnel work in the commissary (catering facility) located in the same facility as the crew base plaintiff managed before his termination. *Id.* Dolores Mejia is the GGI manager in Oakland and oversees all GGI employees working at the catering facility. Mejia Decl. ¶ 1. Twilva Simpson is the Amtrak Manager of Food and Beverage at the Oakland crew base and serves as Amtrak's liaison with GGI. Simpson Decl. ¶ 1.

In early May 2004, Amtrak installed a cash remittance office in the crew base. The installation of the cash remittance office led to several issues relevant to the instant motion. First, plaintiff objected to the installation of the cash remittance office because he believed that it would disrupt OBS operations, and because he felt that it raised safety concerns. *See* Howard Decl. ¶ 15. On May 19, 2004, plaintiff contacted Amtrak's Business Diversity Office to file a complaint regarding his belief that his safety concerns about the cash remittance office were being disregarded on account of plaintiff's race. *Id.* ¶ 20. Plaintiff alleges that defendants retaliated against him, in part, because of this complaint.

The second issue raised by the installation of the cash remittance office relates to security invoices. According to plaintiff, he and other managers, including Anthony Chapa, Patrick Preusser and Jeff Snowden, were charged with the responsibility of creating a safe working environment for the new unit. *Id.* ¶ 16. Plaintiff states that in approximately March 2004, he and the other mangers contacted Reed Brothers, an Amtrak security vendor, and ordered security devices such as locks, keys and screens for windows. *Id.* Plaintiff states that although he signed the invoices because he was the Crew Base Manager, some of the purchases were authorized by other managers, including some significant charges totaling thousands of dollars. *Id.* ¶¶ 16-17. Plaintiff was later terminated, in part, because plaintiff's supervisors were dissatisfied with plaintiff's explanation of various charges on the invoices.

Third, after the cash remittance office was installed, Simpson decided to install a dead bolt lock and buzzer on a door in order to protect GGI employees:

I decided the door which separated the commissary area ("commissary door") from the

2

> crew base needed to be secured to protect GGI employees in the event the remittance office was robbed. Consequently, I had a dead bolt lock and buzzer installed on the door. GGI supervisor Dolores Mejia and I had keys to the door; I did not give Mr. Howard a key because he was not a Food & Beverage employee. For Mr. Howard and all other crew base employees to access the commissary door, they had to press the buzzer, which a GGI employee would answer and open the door.

*Id.* ¶ 3. Plaintiff asserts that this door was not located at or near the entrance to the commissary, but rather was located on the OBS side of a shared work space and break area, within an area of the facility that he supervised.[1] Howard Decl. ¶¶ 5, 6.

Plaintiff states that in this shared work area, he had two large storage cabinets containing office supplies, on board service supplies, and safety equipment, as well as 45 safety deposit boxes in which OBS employees deposited their working funds. *Id.* Plaintiff also states that employee lockers were in this shared work space/break area. *Id.* Plaintiff states that as the crew base manager, he needed to have frequent access to this area on a daily basis. *Id.* ¶ 6.

The parties have submitted conflicting evidence regarding what information, if any, was conveyed to plaintiff regarding the locked door, and whether plaintiff acted "abusively" with regard to buzzing the door. Plaintiff states that he asked Simpson who decided to install the lock on the door, and that Simpson told him that Mejia made the decision and that he should speak to Mejia about obtaining a key. *Id.* Plaintiff also states that no Amtrak manager ever explained to him why he could not have a key to the locked door, *id.*, while Amtrak has submitted declarations stating that Simpson, Simpson's supervisor Michael Dwyer, and other managers explained to plaintiff on several occasions "that he would not receive a key to the commissary door . . . due to GGI safety concerns." *See e.g.*, Simpson Decl. ¶ 4; *compare also* Shelton Decl. ¶ 3 (stating plaintiff told him that he was upset about not receiving a key) *with* Howard Decl. ¶ 23 (denying that he made such a statement to Shelton).

The parties also dispute whether plaintiff became disruptive with the door buzzer, and whether plaintiff's supervisors counseled him regarding the buzzer. Mejia has submitted a declaration stating that on May 12, 2004, approximately one week after the lock and buzzer were installed, she notified Simpson regarding plaintiff's allegedly inappropriate use of the buzzer. "Although I tried to explain

---

[1] It is unclear from the parties' papers exactly where the door was located. The location of the door does not make a material difference to the pending motion. Howard's declaration states that pictures of the work/break area are attached to his declaration (at exhibit 49), but that exhibit is missing.

3

that he only needed to gently tap the buzzer once or twice, Mr. Howard would ignore my explanation and continued to press the buzzer until someone answered the door." Mejia Decl. ¶ 2, Ex. A. Mejia's declaration describes other similar instances. *See id.* ¶¶ 3-5. Plaintiff's supervisor, Steve Shelton, has submitted a declaration stating that he instructed plaintiff that he was to "immediately refrain from abusive use of the buzzer," Shelton Decl. ¶ 3, while plaintiff denies that any such conversation or counseling took place. Howard Decl. ¶ 23; *compare also* Deely Decl. ¶ 4 (describing incident where plaintiff repeatedly pestered GGI employees by separately retrieving bowl, box of cereal, spoon and other items from locker) *with* Howard Decl. ¶¶ 27-28 (plaintiff denying incident happened).

On June 18, 2004, plaintiff arranged to have the keyed lock on the shared work area/break area door replaced with a combination lock and deadbolt. *Id.* ¶ 21. Plaintiff states that Mejia had refused, without explanation, to give him a key to the lock. *Id.* Plaintiff states, "I included a dead bolt lock to give Gate Gourmet the ability to lock the door at night and I gave Ms. Mejia all of the keys to the dead bolt. It was never my intent nor my desire to have access to the Gate Gourmet commissary stockroom." *Id.*

On approximately June 25, 2004, Shelton learned that plaintiff had arranged for the installation of the new lock. Shelton Decl. ¶ 4. Plaintiff met with Shelton and another Amtrak manager, Tom Hall to discuss the installation of the lock. *Id.* Shelton told plaintiff that plaintiff's actions were "in direct violation of instructions that I had personally given to him about access to the door . . . ." *Id.* Plaintiff's account of the meeting is as follows:

> Shelton . . . accused me of disregarding a June 3rd Memorandum from Manager Michael Dwyer by installing a combination lock on the shared work area/break area door. I told Defendant Shelton that I had never received the Memorandum from Mr. Dwyer. In fact, I was on vacation from May 26 to June 9, 2004. I asked Defendant Shelton for a copy of the Memorandum and he refused to give me a copy of the Memorandum. He showed me portions of the Memorandum but he refused to give me a copy. Immediately following the June 25th meeting, I reviewed my records and sent Defendant Shelton an e-mail disclosing to him all of the communications which I had ever received from Mr. Dwyer.

Howard Decl. ¶ 22 & Ex. 23. During the meeting, plaintiff also informed Shelton and Hall that he believed that the decision not to give him a key to the door was racially discriminatory. *Id.* ¶ 25. After the meeting, plaintiff arranged to have the combination lock removed and replaced with a dead bolt. *Id.* ¶ 26.

4

The parties also dispute what happened next. Defendants state that after the June 25, 2004 meeting, defendant Patsy Hall (who became plaintiff's supervisor during the summer of 2004) asked plaintiff for an explanation of various Reed Brothers invoices, and that plaintiff was evasive and failed to provide a proper accounting. Plaintiff disputes that version, and states that he explained various charges, and also that Hall unreasonably requested a explanation of numerous invoices dating back to 2003.

On August 25, 2004, Steve Shelton, plaintiff's supervisor, met with plaintiff and notified him that his employment as an Amtrak manager was being terminated. *See* Shelton Decl. ¶ 6. Shelton provided plaintiff with a termination letter that referenced plaintiff's (1) failure to follow management directives regarding access to the GGI facility and interactions with GGI employees; (2) misuse of company funds relating to the unauthorized security purchases; and (3) failure to properly comply with Hall's directives to explain the unauthorized purchases. *Id.*; *see also* Howard Decl. ¶ 37.

### 2.  **Denial of promotion**

On September 6, 2005, Manager of Crew Services Marcos Gonzalez advertised two Operations Supervisor positions for the Oakland Crew Base. *See* Gonzalez Decl. ¶ 2, Ex. A. One position was to replace a retiring supervisor, Cliff McDaniel. *Id*. Gonzalez states that he posted the other position because an Operations Supervisor, Karol Chaney, requested an adjustment to the timing of her shift, and Gonzalez believed that the applicable collective bargaining agreement required a posting to make that change. *Id*. Both job openings were scheduled to remain open until September 20, 2005. *Id*. Gonzalez sent plaintiff a letter notifying him of the job openings. *Id*. ¶ 3 & Ex. B.

Gonzalez states that because he was a relatively new manager, he contacted a Labor Relations Officer to determine whether he had posted the job openings correctly. *Id*. ¶ 4. The officer informed Gonzalez that the posting of these positions was not restricted to the Oakland district, and that he could post them nationally. *Id*. On September 19, 2005, Gonzalez decided to rescind the posting for McDaniel's position, and repost the position nationally in order to draw a broader pool of applicants. *Id*. Gonzalez also rescinded the posting for Ms. Chaney's position. *Id*. Gonzalez states that he "did not post Ms. Chaney's position nationally because she was not leaving her position and the initial posting

5

was merely to reflect a change to her hours." *Id.* On September 19, 2005, Gonzalez sent plaintiff a letter advising him that the postings for the Operations Supervisor positions had been rescinded. *Id*, Ex. C.

On or about September 20, 2005, Gonzalez spoke to a Human Resources manager about coordinating the national posting for the Operations Supervisor position to replace Mr. McDaniel. *Id.* ¶ 6. Gonzalez states that in early October 2005, Steve Shelton suggested that Amtrak shift the position replacing Mr. McDaniel to Sacramento, California, and that Gonzalez agreed that this was an appropriate shift because operations in Sacramento were growing and that location needed the administrative support offered by an Operations Supervisor. *Id*. ¶ 7. Gonzalez states that because the administrative and operational needs in Sacramento were somewhat different than the requirements for Oakland, he prepared a new job description. *Id*. & Ex. D.

The Sacramento Operations Supervisor position was posted nationally between March 6 and 13, 2006. *Id*. ¶ 8. That posting yielded three candidates, including plaintiff and Dan Butler. *Id*. Gonzalez states that the candidates were evaluated based on four categories: merit, knowledge, fitness and seniority. *Id*. Gonzalez was on a three-member interview panel with Susan Venturelli, Human Resources Officer, and Michael Hamilton, Trainmaster for the Bay District, Pacific Division. *Id*.

Gonzalez states that after interviewing plaintiff and Mr. Butler, the interview panel agreed that Mr. Butler's interview responses were superior to those provided by plaintiff. *Id*. ¶ 9. According to Gonzalez, "I noted Mr. Howard did not answer the questions directly and used the interview as a platform to defend his prior actions. He complained about Amtrak management and insinuated that other Amtrak managers were not concerned about safety." *Id*. Gonzalez's May 2006 interview notes are attached as Exhibit E to his declaration; those notes state, *inter alia*, "Didn't really answer question," and "Attempting to run down mgmt." *Id*. Ex. E. Gonzalez states that in contrast, he was very impressed with Mr. Butler's interview responses. *Id*. ¶ 10. According to Gonzalez, Butler "portrayed a professional demeanor, had more seniority tha[n] Plaintiff and had received a doctorate degree, which was a higher level of education than possessed by Mr. Howard. On balance, I rated Mr. Butler higher than Mr. Howard." *Id*.

Gonzalez states that he made the decision to offer Mr. Butler the Operations Supervisor position

6

1 without input from senior management, including Joe Deely. *Id.* ¶ 11. According to Gonzalez, Deely's
2 involvement in the selection process was solely limited to his instruction in 2005 that Gonzalez should
3 post the Operations Supervisor position following Mr. McDaniel's retirement. *Id.* Gonzalez also states
4 that when he made the decision to rescind the postings in September 2005 and to select Mr. Butler for
5 the Sacramento Operations Supervisor position in March 2006, he was not aware of the *Morgan* case
6 (see protected activities, below) or that plaintiff had testified on behalf of Morgan, nor was he aware that
7 plaintiff had ever filed internal race discrimination complaints, or complaints with the EEOC, against
8 Amtrak. *Id.* ¶ 12.

9 In January 2006, plaintiff was hired as a seasonal utility worker at a drastic reduction in pay.[2]

### 3.   Plaintiff's protected activities

Plaintiff alleges that defendants retaliated against him for filing the May 2004 complaint with Amtrak's Business Diversity Office, and based on his involvement in two race discrimination lawsuits against Amtrak. In 1999, plaintiff joined a class action race discrimination lawsuit against Amtrak pending in Washington D.C., which alleges that Amtrak fails to provide equal training and promotional opportunities to African-Americans. On March 30, 2000, an article about the case, which featured plaintiff, appeared in the *San Francisco Chronicle*.

On April 21, 2004, plaintiff testified in *Morgan v. Amtrak*, C 96-3585 SI, a race discrimination case against Amtrak. Before he testified, plaintiff informed his then-supervisor defendant Shelton, that he had been subpoenaed to testify as a witness in the case, and that he had previously been called to testify as a witness in that case. Defendant Shelton gave plaintiff permission to take off work to testify.

### LEGAL STANDARD

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

---

[2] Plaintiff states that he currently makes $14.33 per hour, or less than $30,000 per year. His annual salary prior to his termination in 2004 was $60,000.

7

1    56(c).

2    In a motion for summary judgment, "[if] the moving party for summary judgment meets its
3    initial burden of identifying for the court those portions of the materials on file that it believes
4    demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so
5    that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts
6    showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors*
7    *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In
8    judging evidence at the summary judgment stage, the Court does not make credibility determinations
9    or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving
10   party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*
11   *Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence
12   presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony
13   in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary
14   judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

**1.    Discrimination**

    **A.    Termination from management position**

Plaintiff may establish a *prima facie* case of discrimination under the *McDonnell Douglas* framework by showing that: "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 604 (9th Cir. 2004). The Ninth Circuit has repeatedly emphasized that a plaintiff's burden in establishing a *prima facie* case of discrimination is "minimal." *Coghlan v. American Seafoods Co. LLC.,* 413 F.3d 1090, 1094 (9th Cir. 2005).

Defendants suggest in a footnote that plaintiff cannot make out a *prima facie* case because his performance was deficient and there are no other circumstances surrounding the termination that give

rise to an inference of discrimination. The Court disagrees, and concludes that plaintiff has established a *prima facie* case. Plaintiff has submitted numerous letters of commendation, including a largely positive draft performance evaluation from March 2004 stating that plaintiff met five out of six goals. *See* Howard Decl. Ex. 30.

Plaintiff has also submitted evidence that Joe Deely, a manager who participated in the decision to terminate plaintiff,[3] had on other occasions made racist remarks about other African-American employees, including using the word "nigger." *See* Plaintiff's Request for Judicial Notice Ex. A; Price Decl. Ex. C at 44-46. This evidence is sufficient to establish a *prima facie* case of discrimination. *See Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148-49 (9th Cir. 1997) (manager's comment that co-worker was "dumb Mexican" could be evidence of discrimination against plaintiff and satisfied *prima facie* case); *see also Heyne v. Caruso*, 69 F.3d 1475, 1479-80 (9th Cir. 1995) ("Evidence of the employer's discriminatory attitude in general is relevant and admissible to prove race discrimination.").

As for the second step of the *McDonnell Douglas* framework, plaintiff does not dispute that defendants have met their burden of articulating a legitimate, non-discriminatory reason for plaintiff's termination, and that the burden shifts back to plaintiff to show that defendants' explanation is really a pretext for discrimination.

A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence. Direct evidence is evidence "which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998). Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer. *See, e.g., Godwin*, 150 F.3d at 1221 (supervisor stated he "did not want to deal with [a] female"); *Cordova*, 124 F.3d at 1149. Circumstantial evidence includes evidence "showing that the employer's proffered explanation for the adverse action is 'unworthy of credence.'" *Coghlan*, 413 F.3d at 1095 (*quoting Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

The Court finds that plaintiff has met his burden through both direct and circumstantial evidence, and thus that defendants are not entitled to summary judgment on this claim. In addition to plaintiff's

---

[3] Defendants admit that Deely was a decision maker, and have submitted Deely's declaration in which he states, *inter alia*, that he did not discriminate against plaintiff on the basis of race.

9

1 evidence regarding Deely's racist remarks, plaintiff has also submitted his own declaration[4] which
2 presents a sharply divergent account of the events surrounding the removal of the lock. Plaintiff's
3 version of events – which the Court must accept as true at the summary judgment phase – raises
4 questions about the credibility of defendants' explanation for the termination.[5]

### B.   Denial of promotion to operations supervisor

Plaintiff asserts that he was denied two promotions – the "new" Operations Supervisor position that was posted in September 2005, and the Sacramento position that was posted in March 2006. The Court notes that aside from briefly mentioning these promotions in the statement of facts and in plaintiff's declaration, plaintiff's opposition does not address these claims and in fact does not advance any legal argument regarding these promotions in connection with either plaintiff's discrimination or retaliation claims.

In order to establish a *prima facie* case on his promotion claim, Howard must show that (1) he is a member of a protected class; (2) he was qualified for the position sought; (3) he was denied the promotion; and (4) individuals outside of the protected class were promoted. *See Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 671 (9th Cir. 1988). It is unclear which of the two September 2005 postings plaintiff is identifying as the "new" posting. However, according to the Gonzalez declaration – which plaintiff has not rebutted – nobody was hired based on the September 2005 postings; one posting was rescinded and later re-posted as the March 2006 Sacramento posting, and the other posting was rescinded entirely. Accordingly, the Court finds that plaintiff has not established a *prima facie* case with regard to the September 2005 job postings because no individual outside the protected class was

---

[4] The Court addresses defendants' objections to plaintiff's declaration *infra*.

[5] For these reasons the Court also DENIES summary judgment on plaintiff's claim for wrongful termination, and plaintiff's "failure to prevent" discrimination claim under FEHA. However, defendants are correct that plaintiff may not pursue a claim for "failure to prevent" discrimination under FEHA, Cal. Gov't Code § 12940(k), against the individual defendants because that FEHA provision applies to an "employer" and not a "person." *See Reno v. Baird*, 18 Cal. 4th 640, 663-64 (1998) ("employer" in FEHA does not include individual supervisors).

promoted into that job.[6]

The record shows that plaintiff has made out a *prima facie* case with respect to the March 2006 Operations Supervisor position. The burden of production shifts to defendant to articulate a legitimate, non-discriminatory reason for plaintiff's rejection. *See Warren v. City of Carlsbad*, 58 F.3d 439, 442 (9th Cir. 1995). Here, the Gonzalez declaration states that the interview panel concluded that the successful applicant, Mr. Butler, performed better in the interview, had more seniority than plaintiff, and had a more advanced degree than plaintiff. The Court finds that defendant has rebutted plaintiff's *prima facie* case.

To defeat summary judgment, plaintiff "must produce evidence of facts that either directly show a discriminatory motive or show that the [defendant's] explanation for his rejection is not credible." *Id*. at 443. Here, plaintiff's only "evidence" of pretext is his statement that "defendants' contention that Mr. Butler was selected because he interviewed better than I did is undermined by my history of competing against Mr. Butler. In February 2003, I competed against Mr. Butler for the Crew Base Manager position and was selected over him." Howard Decl. ¶ 44. The fact that in 2003 plaintiff was selected for a position over Mr. Butler does not show a discriminatory motive with respect to the 2006 promotion, nor does not show that defendants' explanation for the rejection is not credible. Moreover, plaintiff has not submitted any evidence suggesting that Gonzalez acted with a discriminatory motive. Plaintiff has failed to raise a triable issue of fact on this claim – and indeed, as noted above, did not even advance any legal argument with regard to this claim – and accordingly, the Court GRANTS defendants' motion for summary judgment on this claim.

### 2. Retaliation

Plaintiff also challenges his termination and promotion denial as retaliatory. Plaintiff alleges

---

[6] At the hearing, plaintiff's counsel asserted that summary judgment regarding this promotion was inappropriate because the "Form NRPC 2000" filled out for plaintiff when Amtrak terminated him in 2004 indicates that he was deemed ineligible for rehire. This fact, however, has no bearing on whether plaintiff has made out a *prima facie* case regarding the September 2005 positions. Indeed, the facts that Amtrak specifically notified plaintiff of the September 2005 postings, and interviewed plaintiff in 2006 for the Sacramento position, indicates that in fact plaintiff was considered eligible for rehire.

11

that defendants retaliated against him for testifying in the *Morgan* case, participating as a class member in a national race discrimination case, and/or filing internal discrimination complaints. Defendants move for summary judgment on the ground that none of the decision makers involved in the termination or failure to promote decisions knew about plaintiff's protected activities.

In order to establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in protected activity; (2) his employer subjected him to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *See Ray v. Henderson*, 217 F.3d 1234, 1239 (9th Cir. 2000). In order to show a causal link, a plaintiff must show that the individuals who allegedly retaliated were aware of the plaintiff's protected activity. *See Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) (affirming grant of summary judgment on retaliation claim where plaintiff failed to submit such evidence).

### A. Termination

Defendants have submitted declarations from the three decision makers (all of whom are individual defendants) Shelton, Hall and Deely. Shelton and Deely both state that they were not aware of plaintiff's protected activities at the time of plaintiff's termination from the management position, although Shelton does not deny that plaintiff informed him that plaintiff was a witness in the *Morgan* trial.. *See* Shelton Decl. ¶ 7; Deely Decl. ¶ 7. Hall states that at the time of plaintiff's termination she was not aware of his testimony against Amtrak in the *Morgan* case, nor was she aware of any internal complaints that plaintiff made alleging racial discrimination. *See* Hall Decl. ¶ 10. Hall also states,

> I had a vague awareness that he was involved in a lawsuit against Amtrak. I was not, however, aware that he was alleging anything to do with race harassment or discrimination. At the time of Mr. Howard's termination, I believed the claims had something to do with violating one of Amtrak's collective bargaining agreement regarding placements into union positions. Certainly, my decision to recommend termination had no relationship to whatever Mr. Howard's roll [sic] was in that lawsuit.

*Id.* Based upon these declarations, defendant contends that plaintiff cannot make out a *prima facie* case.

Plaintiff has submitted evidence of the following: (1) on March 30, 2000, plaintiff's involvement in the class action against Amtrak was featured in an article which appeared in the *San Francisco Chronicle*, Howard Decl. Ex. 28; (2) on April 21, 2004, plaintiff testified in the *Morgan* case, and prior

12

to testifying he notified Shelton that he had been subpoenaed to testified as a witness in that case, and that this was the second time that he was being called to testify; (3) the widespread publicity that the *Morgan* case received (including the fact that Deely was involved in *Morgan*); and (4) on July 30, 2004, Amtrak distributed a memorandum directing its employees to retain all documents concerning named class members in the class action suit.[7] Plaintiff also emphasizes the temporal proximity between his protected activities – the testimony in the *Morgan* case, his May 19, 2004 internal complaint, and the July 30, 2004 memorandum – and the August 25, 2004 termination. Finally, plaintiff argues that decision makers "should have known" about his protected activities because "California imposes an affirmative duty on managers and others responsible for the management of an enterprise to prevent discrimination." Opposition at 20:12-14.

The Court finds that plaintiff has established a causal link between his plaintiff's protected activities – in particular his testimony at the *Morgan* trial – and his termination. Despite Deely's declaration to the contrary, the Court finds that a reasonable jury could conclude that Deely was aware of Howard's involvement in the *Morgan* case, particularly in light of the fact that Deely himself was involved in the *Morgan* case, and due to the extensive publicity that the case had received. It is also undisputed that plaintiff informed Shelton that he was testifying in the *Morgan* case; the Court finds this is sufficient to establish a causal link. Finally, Hall states in her declaration that she was aware that plaintiff was participating in a nationwide class action, though she states that she believed the case had to do with alleged breaches of a collective bargaining agreement, not race discrimination. The Court finds that this enough to establish a causal link.[8]

---

[7] The memo is attached as Exhibit 40 to the Price Declaration. The memo is from Amtrak's general counsel to a "distribution list," and plaintiff states that Amtrak has withheld the distribution list, as well as the attached list of class members, on the basis of attorney-client privilege. Plaintiff asserts that the memo was sent to Shelton, Hall and Deely, and that plaintiff's name was included in the list of class members, thereby providing these defendants with notice of plaintiff's participation in the lawsuit. At the hearing, defense counsel stated that Deely almost certainly received a copy of the memo.

[8] Defendants assert – and plaintiff does not appear to deny – that there is no evidence that any of the decision makers were aware of plaintiff's May 2004 internal complaint. Similarly, the record is unclear regarding who received a copy of the July 30, 2004 memorandum, and whether Howard's name was listed on any attachment to the July 30, 2004 memorandum. At trial, if plaintiff wishes to claim retaliation based on the internal complaint, plaintiff must make an offer of proof that any of the decision makers were aware of this complaint. Similarly, if plaintiff intends to rely on the July 30, 2004

13

Assuming plaintiff has made out a *prima facie* retaliation claim concerning his termination, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Manatt v. Bank of America*, 339 F.3d 792, 800 (9th Cir. 2003). Amtrak has articulated a legitimate, non-discriminatory reason for plaintiff's termination, namely that defendants had received numerous complaints about plaintiff harassing a vendor's employees, that plaintiff misused company funds, and that plaintiff evaded Hall when she attempted to investigate his purchases.

Accordingly, the burden shifts back to plaintiff to show that the actions were on account of a discriminatory motive. *Id*. For the reasons stated *supra*, the Court finds that plaintiff has pointed to factual disputes sufficient to meet his burden and summary judgment is DENIED.

### B.     Failure to promote

Plaintiff's complaint alleges that defendants retaliated against him by denying him the Operations Supervisor promotion, and defendants have moved for summary judgment on this claim. Plaintiff's opposition does not address this claim.

Based on the record before the Court, the Court finds that plaintiff has not made out a *prima facie* case that defendant retaliated against him by failing to promote him to the Operations Supervisor position. Plaintiff has not submitted any evidence to show a causal connection between his protected activities and promotion denial; Gonzalez's unrebutted declaration states that he made the decision to offer Mr. Butler the Operations Supervisor position without input from senior management, and that when he made that decision, he was not aware of plaintiff's involvement in the *Morgan* case, or that plaintiff had filed complaints alleging race discrimination. *See* Gonzalez Decl. ¶¶ 11-12. Moreover, even assuming plaintiff has made out a *prima facie* retaliation claim, for the reasons stated *supra*, the Court finds that defendant has articulated a legitimate, non-discriminatory reason for failure to promote, and that plaintiff has not raised a triable issue of fact of pretext. Accordingly, the Court GRANTS defendants' motion for summary judgment on this claim.

---

memorandum as evidence that defendants were aware of his participation in the nationwide class action, plaintiff must make an offer of proof that defendants received this memo, and that Howard's name was included in an attachment.

### C. Individual liability for retaliation under FEHA

Relying on dicta in *Carrisales v. Department of Corrections*, 21 Cal. 4th 1132 (1999), defendants also contend that individual supervisors cannot be held liable for retaliation under FEHA. *Carrisales* held that FEHA's usage of "person" did not create individual liability in harassment claims. *Id*. at 1138. However, as the California Court of Appeal has noted, *Carrisales* limited its decision to the issue of individual liability in harassment claims and "expressly declined to decide the issue of whether individuals can be held liable for retaliation under that provision." *Jones v. Lodge at Torrey Pines Partnership*, 147 Cal. App. 4th 475, 504 (2007).

In contrast, several California Courts of Appeal and the Ninth Circuit have held that individual supervisors may be held liable for retaliation under FEHA. *See Winarto v. Toshiba America Elec. Components, Inc.*, 274 F.3d 1276, 1288 (9th Cir. 2001) ("an individual-supervisor may be held personally liable for retaliation under the FEHA"); *see also e.g.*, *Jones*, 147 Cal. App. 4th at 504 ("an individual supervisor can be held liable for retaliation under section 12940, subdivision (h)"); *Taylor v. City of Los Angeles Dep't of Water and Power*, 144 Cal. App. 4th 1216, 1237 (2006). Although defendants contend that these cases are "wrongly decided," absent a contrary decision by the California Supreme Court, this Court will follow these decisions.

### D. § 1981 Claim for retaliation

Citing two district court cases from 1980, defendant also contends that retaliation is not a viable claim under 42 U.S.C. § 1981. This contention lacks merit. In *Manatt v. Bank of America, NA*, 339 F.3d 792 (9th Cir. 2003), the Ninth Circuit held that "where a plaintiff charges an employer with racial discrimination in taking retaliatory action, a cause of action under § 1981 has been stated." *Id*. at 800 (plaintiff alleged retaliation based on complaint of racial discrimination). Here, plaintiff alleges that defendants retaliated against him because of his complaints about racial discrimination and his participation in lawsuits alleging racial discrimination against Amtrak.

### 3. Intentional and negligent infliction of emotional distress

Plaintiff has alleged claims for intentional and negligent infliction of emotional distress.

15

1 Defendant has moved for summary judgment on both of these claims. Plaintiff's opposition does not
2 address these claims.[9]

3 The elements of the tort of intentional infliction of emotional distress are: (1) extreme and
4 outrageous conduct by the defendant with the intention of causing, or reckless disregard of the
5 possibility of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional
6 distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous
7 conduct. *See Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (1993).

8 Defendants argue that neither a termination nor a failure to promote can constitute "extreme and
9 outrageous" behavior. To meet this element of an intentional infliction of emotional distress cause of
10 action, a defendant's conduct must be "so outrageous in character, and so extreme in degree, to go
11 beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a
12 civilized community." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1068 (9th Cir. 2002)
13 (citation omitted).

14 Here, the Court finds that defendants' actions, even to the extent that they might be considered
15 discriminatory, are not sufficient to allow recovery for intentional infliction of emotional distress. *See*
16 *King v. AC & R Advertising*, 65 F.3d 764, 770 (9th Cir. 1995) (citation omitted) (defendant's age-related
17 comments, while "offensive and perhaps discriminatory, were 'not so egregiously outside the realm of
18 civilized conduct to give rise to actionable infliction of emotional distress'"); *see also Janken v. GM*
19 *Hughes Electronics*, 46 Cal. App. 4th 55, 80 (1996) (stating that the remedy for an unlawfully motivated
20 personnel decision is an employment discrimination action, not an emotional distress suit). Because
21 defendants' actions cannot, "reasonably be regarded as so extreme and outrageous as to permit
22 recovery," the Court GRANTS summary judgment on plaintiff's intentional infliction of emotional
23 distress claim. *Schneider v. TRW, Inc.*, 938 F.2d 986, 992 (9th Cir. 1991).

24 With regard to negligent infliction of emotional distress, plaintiff has failed to point to negligent
25 conduct that caused him harm. *See Molien v. Kaiser Foundation Hospitals*, 27 Cal.3d 916, 921 (1980).

---

[9] Defendants' reply brief states that plaintiff's opposition "expressly states" that these claims should be dismissed as a matter of law. The Court could not find any such statement in plaintiff's papers, although such a concession is implicit by virtue of the fact that plaintiff failed to address these claims in the opposition.

16

Employment decisions such as termination and failure to promote are inherently intentional. *See Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal.3d 148, 160 (1987); *see also Edwards v. U.S. Fidelity & Guar. Co.*, 848 F. Supp.1460,1466 (N.D.Cal. 1994) ("[W]here the conduct is intentional, it cannot be used as the basis for a negligent infliction of emotional distress claim."). Plaintiff has not presented any facts which would implicate negligence of any kind on behalf of defendants, and accordingly the Court GRANTS summary judgment on this claim.

### 4.     **Punitive damages**

Defendants argue that plaintiff does not have any evidence showing that defendants acted with malice, fraud or oppression when they terminated plaintiff. In light of the Court's denial of summary judgment on plaintiff's discrimination and retaliation claims concerning his termination from management, the Court finds that plaintiff's punitive damages claims should go to the jury.

### 5.     **Objections**

Each side has filed voluminous objections to the other's evidence. Defendants object to virtually all of plaintiff's declaration on numerous grounds, including *inter alia*, that it lacks foundation, is speculative, some statements contradict his deposition testimony, and consists of hearsay. As a general matter, the Court finds that many of defendants' objections are not well-founded; plaintiff's statements regarding his physical work space, his job duties, and what he thought or understood do not lack foundation nor are they speculative. Similarly, several statements that defendants object are "flatly contradicted" by plaintiff's deposition testimony are not clearly inconsistent (e.g., testimony regarding plaintiff pounding his fist at a meeting). Because the Court finds that plaintiff has submitted sufficient evidence to defeat summary judgment on certain claims, the Court will not at this juncture rule on each of defendants' numerous evidentiary objections. However, defendants may renew specific objections to discrete areas of testimony, or to particular exhibits, either through a motion in limine or at the time of trial.

Plaintiff has also objected to certain declarations filed by defendants as irrelevant. The Court OVERRULES these objections, without prejudice to renewal either in pretrial filings or at the time of

17

trial. In general, the Court finds that testimony about plaintiff's behavior as a supervisor – including whether he was abusive to his subordinates – could be relevant to the issues surrounding his termination depending on what other evidence the parties intend to introduce at the time of trial.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS in part and DENIES in part defendants' motion for summary judgment. (Docket No. 79). The Court GRANTS plaintiff's request for judicial notice. (Docket No. 108). The Court OVERRULES the parties' objections. (Docket Nos. 104 & 116).

**IT IS SO ORDERED.**

Dated: April 30, 2007

SUSAN ILLSTON
United States District Judge